


# ARKANSAS COURT OF APPEALS

DIVISIONS I & II
No. CV-13-524

| | |
|---|---|
| | **Opinion Delivered** February 19, 2014 |
| JOEY HOOSIER ET AL. | |
| APPELLANTS | APPEAL FROM THE GARLAND COUNTY CIRCUIT COURT [NO. CV-10-952] |
| V. | |
| | HONORABLE MARCIA R. HEARNSBERGER, JUDGE |
| INTERINSURANCE EXCHANGE OF THE AUTOMOBILE CLUB | |
| APPELLEE | AFFIRMED |

## JOHN MAUZY PITTMAN, Judge

This case involves a motor-vehicle accident that occurred on September 10, 2009, in Arkansas. Appellants were traveling on Interstate 30 when they were struck head-on by a vehicle driven by Jerry Adams. Mr. Adams, who was determined to be at fault in that accident, had automobile insurance with a policy limit of $50,000. Appellant Cyrena Hoosier sustained severe injuries and incurred approximately $200,000 in medical bills. Mrs. Hoosier was an insured on an automobile-insurance policy issued by appellee Interinsurance Exchange (AAA) with a limit of $50,000 for damages caused by an underinsured motorist. Appellants brought an action against AAA asserting that they were entitled to underinsured-motorist benefits under their policy. The trial court granted summary judgment to appellee AAA, and this appeal followed. We affirm.

The crucial question in this case is whether the law of California or that of Texas should be applied in interpreting the underinsured-motorist provisions of appellants'

insurance policy. The Arkansas Supreme Court has long held that matters bearing upon the interpretation of a contract are to be determined by the law of the place where it is made. *Howcott v. Kilbourn*, 44 Ark. 213 (1884). Appellants were residents of California when their automobile–insurance policy was issued in that state on March 21, 2009, under the auspices of the AAA Automobile Club of Southern California. The policy expiration date was March 21, 2010. Part IV of the insurance contract sets out the terms of the uninsured and underinsured–motorist coverage (Coverage F). The definitions section of Coverage F provides that:

> ***Underinsured motor vehicle*** — means a motor vehicle which at the time of the accident is either:
>
> (a) insured under a motor vehicle liability policy or an automobile liability insurance policy; or
>
> (b) self–insured; or
>
> (c) covered under a cash deposit or bond posted to satisfy a financial responsibility law;
>
> but for an amount that is less than the limits shown in the declarations for COVERAGE F.

The policy language mirrors the definition of underinsured motor vehicle set out by the California legislature in California Insurance Code § 11580.2(p)(2) (Deering 2009).[1] The meaning of this provision under California law is clear:

---

[1] "'Underinsured motor vehicle' means a motor vehicle that is an insured motor vehicle but insured for an amount that is less than the uninsured motorist limits carried on the motor vehicle of the injured person."

SLIP OPINION

Underinsurance coverage does not apply unless the tortfeasor's vehicle is an underinsured motor vehicle. An underinsured motor vehicle, by definition, is a vehicle insured for an amount that is less than the uninsured/underinsured motorist limits carried by the injured person. Thus, if the tortfeasor is insured for an amount equal to or greater than the uninsured/underinsured limits of the injured person, that person never gets to collect any underinsurance coverage.

*State Farm Mutual Automobile Insurance Co. v. Messinger*, 283 Cal. Rptr. 493, 496 (Cal. Dist. Ct. App. 1991).

In the present case, the tortfeasor (Adams) was insured for liability for bodily injury in the amount of $50,000 per person. The uninsured/underinsured-motorist limits of the injured persons (appellants) were likewise in the amount of $50,000 per person. The amounts being equal, appellants' underinsured-motorist coverage under their AAA policy was, under California law, never triggered, and they are not entitled to collect any underinsurance amount from AAA. *See id.*

Recognizing this, appellants assert no claim under California law. Instead, they argue that the provisions of their insurance policy are governed by Texas law because they had moved to Texas three months before the wreck, as reflected on a change to the declarations page of their policy noting that their residence had changed to Houston, Texas, effective June 4, 2009, and that there would be no change to the premium. Appellant Joey Hoosier asserted that, when he went to appellee's office and notified their insurer of their move, he was told that the policy "was converted to a Texas Policy." The location of the branch office and the employee to whom Mr. Hoosier spoke were not identified. Appellants argue that this presented a question of material fact that precluded the grant of summary judgment, and that the trial court therefore erred by granting it.

3

SLIP OPINION

Summary judgment may be granted only when there are no genuine issues of material fact to be litigated and the moving party is entitled to judgment as a matter of law. *Nationwide Mutual Fire Insurance Co. v. Citizens Bank & Trust Co.*, 2014 Ark. 20, ___ S.W.3d ___. Once the moving party has established a prima facie entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. *Holt Bonding Co. v. First Federal Bank*, 82 Ark. App. 8, 110 S.W.3d 298 (2003). On appeal from the grant of summary judgment, we determine if there are genuine issues of material fact in dispute by viewing the evidence in the light most favorable to the party resisting the motion and resolving any doubts and inferences against the moving party. *Nationwide Mutual Fire Insurance Co.*, *supra*. As to the issues of law presented, our review is de novo. *Id*.

Whether appellants' move caused their California-issued insurance to be "converted to a Texas Policy" is a matter of law, not of fact, and we therefore afford no weight to the asserted hearsay statement of an unidentified branch-office employee in determining whether summary judgment was proper. Instead, we look to the insurance contract itself. Although the policy-change declarations page did reflect a change of residence by appellants, it expressly stated that "[t]hese declarations, together with the contract and the endorsements in effect, complete your policy." The only reasonable conclusion to be drawn from this language is that the original California policy remained in effect despite appellants' residence change.

The only reference to a change of primary residence as affecting a policy provision appears in the "Guaranteed Renewal Endorsement" in which the insurer agreed not to cancel or refuse to renew the policy, but which stated that this agreement would become void upon the occurrence of specific enumerated events, including if "[y]our primary residence is outside the state of California." Plainly, the agreement that would become void upon such a change of residence was the agreement to guarantee renewal; with respect to the policy per se, the Guaranteed Renewal Endorsement expressly provides that "[a]ll provisions of your policy not affected by this endorsement remain unchanged."

In the absence of any material change to the policy provisions upon appellants' change of residence, the only remaining question is whether the change of residence from California to Texas had the legal effect of changing the state in which the insurance policy was issued. Under Arkansas law, it did not. The law of the place where the contract was made prevails. *Lincoln National Life Insurance Co. v. Reed*, 234 Ark. 640, 353 S.W.2d 521 (1962).

> The validity, interpretation and obligation under a policy applied for, executed and delivered to the insured in one state has been held governed by the law of that state, though the insured subsequently moved elsewhere. The laws of the latter place apply only to remedy and procedure.

*Id.* at 643, 353 S.W.2d at 523.

Affirmed.

GLADWIN, C.J., and WALMSLEY and WOOD, JJ., agree.

HIXSON and BROWN, JJ., dissent.

**KENNETH S. HIXSON, Judge, dissenting.** On the facts of this case I believe the trial court erred in applying California law to the Hoosiers' underinsured-motorist claim against

the appellee. Because Texas law should have been applied, I dissent from the majority's holding and would reverse and remand.

In this case the parties agree that if California law applies, the Hoosiers are not eligible to receive UIM benefits. However, if Texas law applies, the Hoosiers are entitled to UIM benefits assuming their damages exceed the limits of the tortfeasor's policy as they claim.

In deciding whether California or Texas law should apply, there are two significant Arkansas cases. In reaching its conclusion that California law applies to this case, the majority relies on *Lincoln Life v. Reed*, 234 Ark. 640, 353 S.W.2d 521 (1962). *Lincoln* generally stands for the proposition that the doctrine of *lex loci contractus* (lex loci) should apply in a choice-of-law insurance case. Lexi loci provides that the law of the jurisdiction where the contract was entered into should apply. One of the primary rationales behind the lex loci rule is that the law associated with the location of risk should control. The supreme court in *Lincoln* held that, where the insured purchased several disability policies in Tennessee and later moved to Arkansas, the law of Tennessee applied to his disability claim.

The second case is *Southern Farm Bureau Casualty Insurance Co. v. Craven*, 79 Ark. App. 423, 89 S.W.3d 369 (2002). In that case, the Cravens were Arkansas residents and purchased an auto-insurance policy through Southern Farm Bureau. The Cravens were injured in an accident in Colorado, and they asked the Arkansas court to apply Colorado law, which mandated significantly higher UIM coverage than that required under Arkansas law. The trial court declined to apply Colorado law, and we affirmed.

SLIP OPINION

In *Craven*, we acknowledged that choice-of-law questions regarding insurance coverage have traditionally been resolved by applying the lex loci rule. However, we also observed that, in addition to the easy applicability of the lex loci rule, courts sometimes consider, in addition to the place where the contract was made, which state has the most "significant contacts" with the issue at hand. The contacts to be taken into account include (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties. *Craven*, *supra*. We noted in *Craven* that Arkansas courts have not applied the significant contacts analysis in a case involving an insurance contract, but it has been applied in the case of ordinary contracts. *See Ducharme v. Ducharme*, 316 Ark. 482, 872 S.W.2d 392 (1994).

In *Craven*, we held that whether the lex loci rule or the significant contacts analysis was applied, the insurance contract at issue was governed by Arkansas law. That was because although the traffic accident occurred in Colorado, the auto-insurance contract was made in Arkansas, and virtually all significant contacts were with the state of Arkansas. The insureds were Arkansas residents, the contract was written through an Arkansas agent, the insured vehicles were registered and principally located in Arkansas, and the policy complied with Arkansas law regarding minimum coverages.

It should be noted that the insurance policy at issue in *Lincoln* was a disability policy as opposed to an automobile policy, and the underwritten risk for disability would not be significantly different for Tennessee versus Arkansas. It should also be noted that the Lincoln

court relied in part on the 1962 version of *Appleman on Insurance*, and that since that time there have been significant changes to insurance law and in the itinerant nature of our society in general. While the lex loci approach was dominant in 1962, the "significant contacts" test has since gained popularity.

The 2013 version of Appleman is more on point than the 1962 version cited in *Lincoln*. *Appleman on Insurance* § 6.02[2][a] (2013) provides in part:

> The lex loci rule was adopted in the first Restatement of Conflict of Laws in 1934. The primary virtues of the rule were thought to be simplicity and certainty, although its application has become more complex in modern times. Once the majority rule, it is now followed by only ten states. [Arkansas was not cited as one of the ten states].

Under the modern Restatement 2d rule, the most significant relationship test is now the majority approach, as many states have found the traditional lex loci test too rigid in its application. Restatement 2d § 193 provides, "The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy," unless some other state had a more significant relationship to the transaction and the parties. *Appleman on Insurance* § 6.02 [3][b] (2013).

Similarly, C.J.S. on Insurance, also cited in *Lincoln*, more recently sets forth the significant relationship test. 44 *C.J.S. Insurance* § 28 (2007) provides:

> *Fire, surety and casualty insurance*: In the absence of an effective choice of law by the parties, the validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood to be the principal location of the insured risk during the term of the policy unless with respect to the particular issue, some other state has a more significant relationship. . . . For purposes of this test, an insured risk is the object or activity

SLIP OPINION

which is the subject of the insurance, and it has its principal location in the state where it will be during at least the major portion of the insurance period. *Under this test, even if the principal location of the risk shifts to some state other than the state at the time of contracting, application of the law of the other state would not be unfair to the insurance company if the insurance company had reason to foresee there might be a shift in location* (emphasis added).

Turning to the facts in the case at bar, the auto-insurance policy purchased by the Hoosiers in March 2009 was undeniably a California policy at that time. The insurance contract issued in California contained a "guaranteed renewal endorsement" providing that the agreement became void in the event that the Hoosier's residence was outside of California. However, in June 2009 Joey Hoosier notified his insurance agent that the Hoosiers had moved from California to Texas, and in his affidavit Mr. Hoosier stated that the agent informed him that the insurance contract was converted to a Texas policy and that no additional premium was required. The appellee insurance company, IEAC, was authorized to issue insurance policies in Texas, and in June 2009 it acknowledged the move to Texas and issued a new declaration sheet reflecting the new Texas address.

In my view, this case is governed by Texas law whether we use the *lex loci contractus* approach or the significant contacts approach. Even though the contract was originally made in California, it was effectively reissued in the state of Texas after the Hoosiers moved there and IEAC issued a written policy change for a change of residence, with a policy-change effective date of June 4, 2009. Even under lex loci, one of the most important underlying rationales is the location of the risk. Here, the location of the primary risk was in Texas, and IEAC was fully aware of that location. Under the significant relationship approach, all the

contacts are in Texas. The only relationship with California is that California is probably where the premiums were sent.

Therefore, in my view the trial court erred in applying California law and thereby entering summary judgment for IEAC. Because Texas law should have been applied, and the parties agree that under Texas law the Hoosiers may make a claim for underinsured–motorist benefits in excess of the tortfeasor's policy limits, the summary judgment should be reversed. I would reverse the summary judgment and remand for a trial for the Hoosiers to present evidence of their damages.

BROWN, J., joins.

*Paul Pfeifer*, for appellants.

*Laser Law Firm, P.A.*, by: *James M. Duckett*, for appellee.